The final case is case number 131026 and 131032. Concerned Citizens & Property Owners et al. v. Illinois Commerce Comm'n et al. Councils for the Appellant, it's my understanding that you have agreed to split your time. The clerk will give you a three-minute warning. If you go over the agreed time, your co-counsel's time will be shortened. First attorney for the appellant, please step up to the podium, state your name, tell the court who you represent, and proceed with your argument. Thank you, Mr. Chief Justice. May it please the court, I am representing Grain Belt Express. This case comes before the court on the Illinois Commerce Commission's order granting Grain Belt Express a Certificate of Public Convenience and Necessity to build the Illinois portion of a multi-state, multi-billion dollar energy transmission line that will bring wind farm energy from Kansas to the Midwest. But more importantly, this case is about based on how the appellate court ruled whether or not Illinois courts can assume the role of the Commerce Commission to regulate energy industry under the Public Utility Act. With my time, I'd like to address three, two points. First, the interpretation of 406.1 F3's capable of financing requirement. And then second, the other statutory arguments raised in the appellate court that the appellate court reserved that we would respectfully request the court to address under interest of judicial autonomy. Section 406.1 F3 is a requirement under the Public Utilities Act that states that a public without significant adverse financial consequences for the utility or its customer. In the Commerce Commission, the appellees, the Landowners Alliance appellees specifically, had argued that Section 503 put a condition precedent on the financing requirement to say that before a CPCM can be issued, the financing must be in place. The commission rejected that. The commission stated that the General Assembly wanted to make that as a requirement, would have explicitly stated so. Instead, the Commerce Commission found that the requirement meant that you had to be capable and mean that you had to be able to secure the financing going forward. Evidence was presented to show that Invenergy Transmission, which is the parent company of Grain Belt Express, has in the last 20 years produced over 4,000 miles of transmission lines, $47 billion in contracts. Two witnesses specifically testified. One alone had been a part of $5 billion in financing, and another testified that she had been part of $1 billion in financing in El Salvador. They also gave testimony and evidence that they had relationships with large financial institutions, including Wells Fargo, GE Capital, J.P. Morgan, Bank of America, Morgan Stanley, the sort of financial institutions you would need to finance a project of this scope and complexity. Was there contrary evidence presented where you failed to come up with findings? I don't think there was contrary evidence. There was an argument that balance sheets weren't provided, that additional evidence that could have been produced. But the standard of review for the appellate court and for this court is substantial evidence. Was the evidence sufficient to have an understanding that they would have been capable of financing? And, you know, it's sort of a manifest way to the evidence review, even though it's substantial evidence. And not only that, under the Administrative Review Code, the findings of the commissioner are to be assumed to be prima facie true. So the commission does the work and interprets whether or not the financing is capable. They interpret that based on Invenergy Transmission's experience and Grain Belt would have the ability to bring this financing. Now, the Fifth District, on review, without stating specifically, took the contrary interpretation of statute, saying that, in fact, it did provide a condition precedent for the issuance of a CPCN. Based on that interpretation, the court then found there wasn't sufficient evidence to show that Grain Belt Express had the entire financing ready to go before even the first easement had been purchased. And why this is important is we're talking about energy policy that's created by the General Assembly that has been given to the Commerce Commission to regulate and enforce. We are talking incredibly complicated subject matter. I mean, energy, construction, labor, and then the financing itself. This court, in 2017, actually discussed the merchant and transition method that was then an issue with the Rock Island line. And Grain Belt Express initially had filed for a CPCN under the Public Utility Act at that time. This court reversed on Rock Island, saying that the Public Utility Act didn't allow for non-public utilities to seek a CPCN. But the legislature in CEJA incorporated, added Section B-5 to Section 406 to say that a qualified direct current applicant could apply for a qualified direct applicant program, which is specifically designed as this project that would run from Kansas into the Illinois portion. So it was left to the Commerce Commission to make these determinations on whether or not the financing was available. But the Fifth District's interpretation simply says, well, if you don't have all the money, then you can't do anything. Counsel, what's the strongest argument in favor of affording deference to the Commission's interpretation of the Public Utilities Act? Well, first, I don't think that the statute is ambiguous. I think that the Commerce Commission's interpretation is a straightforward, reasonable interpretation of the statute, which under this Court's precedent, if it's a reasonable interpretation, the Court will accept. This Fifth District provided no analysis to suggest that it was ambiguous and it was making a question of law. And further, it gave no deference at all to the Commerce Commission's fact-finding. And, you know, as we pointed out in our briefs, you know, this comes in the wake of the U.S. Supreme Court reversing Chevron in Luper-Bright. Now, this Court in Church v. State has provided that Illinois law gives agency deference. But that, you know, so Supreme Court precedent doesn't get rid of that. This Court should affirm that we're still applying deference to these important commissions and agencies that deal with this technical nature. I, on my time, we would ask that the Court reverse the Fifth District and to affirm the Commerce Commission. Thank you, Mr. Bull. Your Honors, Counsel, please decourt. I'm Christopher Turner here on behalf of the appellant, the Illinois Commerce Commission. This Court should reverse the appellate court judgment and affirm the commission's final administrative decision issuing the Certificate of Public Convenience and Necessity to Greenbelt. I'll refer to them as GBX because the commission's finding that GBX satisfied subsection 406.1F3 was supported by substantial evidence. And as Greenbelt has argued here, the commission's decision is otherwise consistent with the provisions and the commission's authority under the Act. And also subsection 406B5 does not violate the Illinois Constitution. Now, I tend to argue here first about the commission's finding that GBX demonstrated it is capable of financing the project, was supported by substantial evidence, but the appellate court failed to give the proper deference to that finding. Instead, reweighed the evidence, really ignored the evidence, and effectively misinterpreted F3, subsection F3, to require that applicants prove that they already either have the financing in place or related legal commitments for the financing in place. If there's time permits, I'd like to also argue that the landowners have failed to meet the burden to show that subsection 406B5 violates either the special legislation, equal protection, or a separation of powers clauses. The Act and the Court's authority instruct that the commission's findings are prima facie true and correct. And they are applied, as Counselman for GBX mentioned. The standard substantial evidence standard has been equated with the manifest way of the evidence standard. So there need only be more than a scintilla of evidence in the record in order to affirm the commission's decision. And here, the GBX evidence was far more than a scintilla that it was capable of financing the project without significant adverse financial consequences. Not only did it give evidence, extensive testimony about the method it was going to use, the project finance basis, which is commonly used in the industry for such large energy projects, but it provided evidence of both its management teams and the developer parent corporations experience raising billions of dollars in order to develop over 4,000 miles of transmission lines and other energy projects. In addition to that, they provided evidence of the relationships of major lenders to the energy industry, to the liquidity in the market, and most importantly, as the commission found, that there was ample evidence of both the market need for the capacity for this particular project and developer interest in the project to find that they would be able to enter into sufficient customer contracts that would, under the project finance basis, would allow them to raise the necessary funding. Your co-counsel, Mr. Vought, mentioned the looper right decision in the U.S. Supreme Court and the deference standard. So does that rule here, or he argues, or he mentioned the terse decision. How instructive is the U.S. Supreme Court case as far as the deference that should be given to the ICC? Your Honor, it has no relevance to the Illinois law and the deference that this court has provided to state agencies' interpretation of state statutes. Local right number enterprises address federal court's deference to federal agencies interpreting federal statutes. It reversed the Chevron decision. In fact, this court has never relied on Chevron. It didn't adopt Chevron in order to defer to state agencies. Instead, it has deferred to state agencies' interpretation of statutes based on its own long-held jurisprudence in cases from this court going back to really the 1930s. And in fact, Loper-Bright was specifically when it reversed Chevron on the deference it provided, did so based on the text of the Federal Administrative Procedure Act. This court, of course, doesn't defer to state agencies based on the Federal Administrative Procedure Act. Our statutes don't have the same language as that act. Instead, our statutes, actually the most important statute, the Public Utilities Act, Section 10-201, that governs administrative review actions, it says that the orders and decisions of the commission should be prontofacial reasonable. It has nothing stating that the court must interpret statutes unlike the Federal Administrative Procedure Act. So, really, the landowners provide no basis for Loper-Bright Enterprises to change Illinois law or for this court to basically jettison decades of its authority on granting deference to the commission's interpretations of the act. And for that reason, sorry, so going back, this court may not really need to reach that issue as long as it agrees that the commission's decision was supported by substantial evidence. And here it was. Landowners really provide no basis for this court not to defer to that factual finding. They claim that it departed drastically from the commission's prior orders. But when the commission previously addressed large interstate transmission lines like this one in the Rock Island decision back in 2014 and in the prior GDX proceeding in 2015, it similarly interpreted and applied subsection F3 in order to not require that the applicants have legal commitments for financing in place and instead use the project finance basis to fund the project just with very similar evidence to the evidence that was presented here in this proceeding. Regardless, as this court has recognized, the commission has the power to deal freely with each situation that comes before it, even if it's similar or identical to prior situations and proceedings. While it's provided less deference, it's only done so when the commission's order departed drastically from a prior rule of decision. And so that is like in the business, sorry, the BPI decision where the commission's order, a weight-making order, had directly violated the test year rule under the Act, which was a law-and-held rule that governs weight-making proceedings. Here, the landowners point to no such prior commission order having any sort of decisional rule like that defining what type of evidence is necessary to satisfy F3 or what kind of evidence is insufficient to satisfy F3. Could you use some tools of statutory interpretation to help us understand the words is capable? Well, I mean, we can go directly to, first of all, the definition of capable, which this Court often looks to dictionary definitions. It means that the attributes or the ability to do something. But more importantly, the entire statement is, you know, sorry, the General Assembly could have used language and said that the applicant must show that the project is, the construction is financed or that the applicant has financing or has the funding to construct the project. They didn't use that. Instead, they used a very broad, open language that is the applicant capable of financing, doesn't have the attributes to be able to finance the construction without significant adverse financial consequences for itself or the customers, which, again, is a forward-looking statement asking the commission to look at the evidence and determine whether or not the applicant has the kind of attributes to complete the financing for the project without doing what usually would be the case under the Act, without resulting in harm to rate payers or the people who receive that, whatever the utility service that's being provided. We have no dangers of any of that kind in here. And, in fact, that was why the Court adopted the revised financing condition. It was the only kind of risk it saw, and the risk it saw was if, in the unlikely event, the GBX was unable to obtain full financing, that, in that case, this would prevent the only possible risk, which would be to the landowners, like their beliefs, that they would have facilities which had been stuck to build up easements on their properties to be abandoned there. But this finding had nothing to do and did not in any way undermine its first finding, that the GBX has the capability to finance the project, that there is market need and that there is developer interest in the particular project and support its project financing plan so that it will achieve full funding for the project. Now, if Your Honor, unless you have more questions about subsection F3, I would like to turn to the landowners' constitutional challenges to subsection 406B5. Although we usually do not ask the Court to depart from its usual practice of allowing the appellate court to first address such issues, through CJAW, through the Climate and Equitable Jobs Act, the General Assembly has made clear that the transition to clean energy, and in particular through B5 that was added in it, the interstate transmission line is an important policy issue. But the project here has already been delayed over several years, and it will take many years to develop and complete. And so rather than leave this to continued administrative review and additional litigation, the Commission asks this Court to address these relatively straightforward constitutional challenges that are based on rational basis review and otherwise a legally unsupported separation of powers challenge. Now, subsection B5 is not improper special legislation nor violates equal protection because it does not discriminate between similarly situated entities or persons, and even if it did so, its classifications are rationally related to a purpose of the statute. The landowner has never identified any similarly situated entities, whether a public utility or other merchant developer, who is ineligible to seek a certificate under B5 for a similar project. And regardless, this Court has recognized that statutes affecting even a single entity does not constitute special legislation if the law is tailored to a unique situation or circumstance, and that's the case here. The General Assembly added subsection B5 with CEJA to create a streamlined process to allow entities, including non-public incumbent public utilities like GVX, to seek a certificate to build an interstate transmission line designed to bring low-cost renewable energy from the Kansas market to the meso and PGM grids that serve the Illinois ratepayers. And as reflected both in the prior GVX proceeding and in the proceeding now on appeal, this project provides very specific benefits for Illinois ratepayers, not just in lowering prices and bringing renewable energy, but also increasing the reliability of the grid and making it more resilient. For instance, if in our grid we have a major climate event or a storm and we need to get energy from the other grids, and particularly the Kansas grid, the Kansas area, which is in the southwest power pool, the other largest grid serving the United States would then meso and PGM. But even if it did discriminate against a similarly situated entity, the classifications are rationally related to a purpose of the statute. The landowners first point to the requirement that the project go through the nine counties and argue that it is rational, but it is quite rational, and we know why. It's been a twice-approved route by the commission. It's the optimum route for a transmission line that's going to connect both the meso and the PGM grids over the Missouri border where there's a substation, and then into the PGM grid there. And see, my time is running out, so unless you have any further questions, for the reasons that we put forth in our briefs and in GVX's briefs, we ask that you reverse the appellate court judgment and affirm the commission's final administrative decision. Thank you, Mr. Turner. Morning, counsel. Please proceed. May it please the court, opposing counsel, my name is Chuck Davis for the Illinois Farm Bureau, representing over 70,000 farmer members throughout the state of Illinois, including in the nine targeted counties issued here. I'm joined here today by co-counsel John Thies and my other appellee co-counsel here in the courtroom today. Geographically, downstate Illinois is in a unique location as it relates to the energy industry. Counsel, I have a question, just overall. Does the appellate court's decision create a catch-22 for GVX? By that I mean they won't be able to get funding until they have regulatory approval, but they can't get regulatory approval until they have funding in place. How would that be resolved? I believe that we would look in a similar fashion to the Rock Island case, which is what they cited before. The Rock Island case previously, which was a sister organization to Grain Belt, also used that same phrase, catch-22. The catch-22 analysis in that case was? Well, just put the phrase aside. If they need to have funding in place before they can get regulatory approval, how would that be resolved? It seems like there's a tension between those two requirements. Well, what the statute provides is the capability to finance without adverse effects to themselves or the customers. And capability, could that mean the ability to obtain the kind of funding that your opponents talked about from large, reputable organizations such as JP Morgan or whatever else they named? Would that be part of what the definition of capable means? That could be part of the definition of capable. That is true. But what we can look at here is the drastic departure that happened with how the ICC has handled this previously. If you look at the previous evidence that was provided in other cases, which we have cited throughout this brief, it shows this drastic departure that the ICC has taken. If you look at the Rock Island case, there were a number of documents that were presented that were not presented in this case. Prior transactions in equity and debt markets, a chart of calculated cash flow accounts, consolidated balance sheets, these sorts of things that any company would have to present to a lender for any business in order to be approved for financing. When you look at the other ICC cases that we cite throughout the brief, we cite four different Ameren cases that came before the court previously. We cite the American Transmission case, the docket from the ICC, and the Aqua Illinois case. In each of those, when you look through the cases, you look at actually what the commission considered on capability of financing, this issue we're talking about right now. You see words like credit lines, debt and equity markets, short-term credit facility, operating capital, balance sheets, guaranteed funds, intercompany loans and equity infusions, debt and internal earnings, bank lines of credit. These are all things that the commission looked at before, but for reasons that are unknown, they drastically departed in this case with their application of capability of finance without adverse consequences. As I talked about before, we're in a unique location downstate Illinois. We're just south of the high energy demands of places like Chicago and Detroit and just west of the high energy demands of the East Coast. In addition to being right in the middle of the country, downstate Illinois is also flat and not densely populated. As a result, Illinois farmland is already crisscrossed by power lines and pipelines throughout southern Illinois. Illinois farmers are not against electric energy development, green energy or otherwise. They just want energy for public use in Illinois from responsible actors that comply with the laws since they and the next generation of farmers will be compelled to interact with these energy providers that build, maintain, repair and keep the land safe on their farms and next to their homes. The reason we're here is because a shell company wants to build a transmission overpass to Indiana with no service to Illinois customers. This case is about a quest for power, not electrical power, but governmental power. The commission has granted a private company, GBX, the legal fast track to take land from Illinois citizens, not because it proved necessity or public use, not because it demonstrated financial readiness, but because it promised it might be able to finance it someday on very scant evidence. I interrupted you there. You speak of the separation of powers idea. I think that's where you're going. Here the legislature chose specific language that obviously the commission was bound by, the courts were bound by. The legislature chose this language. So back to the statutory interpretation. What does is capable mean? One of the arguments here is the legislature could have chosen much more narrow language, but they chose very broad language. Does that in and of itself make it ambiguous or bring it down to the question of using our usual tools of statutory interpretation, what do those words mean in your view? Is capable of financing means that it can, it is, it has assurances from, let me restate that. What is capable of financing means is that it has the resources, backing, documentation, everything else that has been provided in all of these other ICC cases to move forward. The key distinction here as to why the ICC here overstepped the Ultra Virus Act. No, I'm back to the statutory interpretation. The legislature did not choose the language has financing, has commitments for financing. They chose this very broad language. The appellate court here interpreted it in a very narrow way. Why isn't the appropriate interpretation is that the legislature very much meant this very broad interpretation. With the special legislation, what they did not do was change that language that is accurate. And that's all we can do is look back at how the commission has treated it previously and why that is distinct now. This revised financing condition shows that the burden had not been met in this case whatsoever. So that's a fact question. I'm trying to do two different ideas. There's a statutory interpretation question. What do these words mean? And then were there sufficient facts to support that claim? You seem to be arguing there are fact questions here. I'm back to what does the statute itself mean, the language mean? Yeah. I do think that if we're going to look at the statutory interpretation of it, of this question, and we compare it to this Court's action before and look at the Citizens Valley case, the primary evidence that was brought forward by GBX in this matter was what I call the wealthy parent, is that they are a subsidiary of Invenergy. This is not uncommon that special entities are created as subsidiaries of a larger entity in this industry. That is true. But what the primary argument they bring forward is that we have the capability of financing because we have this multibillion-dollar parent that can help bring money to the table, connections, banks, and all these sorts of things. In the Citizens Valley case, the exact same facts were presented. In that case, it was on the development of a water and sewer system, and the only evidence that was submitted regarding financial capability was the owner's testimony that he and his brother were financially able to build the water and sewer facilities and, if necessary, would furnish the money to Sunny Acres, the provider in this case. There was no disclosure as to the method the owner proposed to utilize in supplying this money, whether it was provided by a loan or any other fashion. In that case, there was no actual commitment. There was no signed loan guarantee or anything to that effect, and this court said that that was not good enough. There had to be assurances in the capability to finance at the commission. GDX and ICC point to the Northern Moraine case as kind of an exception to this to say, well, the courts looked at it a different way, which also involved what I'd call a wealthy parent. But if you look into the details of that case, it's much different. The subsidiary entity was not a shell company like the one at issue. If you review that case, Rockwell had its own substantial net worth and independent of the parent company. It also supplied the commission with an independent auditor's report demonstrating its own substantial assets. It already owned its own water and sewer facilities, had a $1.8 million equity stake in those facilities, and had a letter of credit for $1.7 million. That is how this court has interpreted the ICC interpreting this provision of the statute before. These are the same facts we have here as in Citizens Valley, and I would urge this court to continue to follow that precedent. Well, isn't it a little bit different than Citizens Valley? I mean, there it was really an individual coming in and just testifying about what he felt he financially could do, he and his brother. Here, they had much more in-depth testimony and information that came from their own Ms. Shine and Shan or Shane's, someone that came in and testified about what is done in this industry and how financing occurs and their experience and what they're doing on behalf of this company. I mean, it's really not the same, is it? Your Honor, I would equate it to right now, if you were to walk out of the courtroom right now and walk to Illinois National Bank across the street and say, I have an idea to start this business. I don't have any documentation with me here today, but I have a character reference with me who really knows a lot about this subject. This is a small town. Everybody knows that my grandpa is the wealthiest person in town, and he's going to financially support this project. He's going to step in. I would like a bank loan today. That is the exact same thing that is occurring in this case. There is no distinction. There were just statements made. There was conjecture made. There was no evidence presented in the record. What I would ask you to do is to call your attention to a few points in the record that shows how the ICC considered this. I call your attention to record pages 433 to 434. On those pages, ICC staff witness Maurer testified that GBX must satisfy all the statutory criteria before the commission can grant a certificate, but he did not review any information on any specific transmission services customers, any interested purchasers, or lessees of the project. Another record site I'd ask you to call your attention to is pages 391 to 392. On those pages, you'll find that ICC staff witness McNally admitted that he, one, didn't review any financial documents, and two, had no idea if the applicant had a positive net worth. However, because of the revised financing condition that was put in place, he had no need to look further at financial documents, and he limited his review simply to the revised financing condition. That is a serious overstep and ultra-virus action of the commission in this case. The statute says the capability of financing needs to be found at the time that the order is issued. What has been created here is something not provided for in statute. There is no ability within the statute to put forward a revised financing condition. Also, from the evidence in this case, what you'll find is that no one knows what's going to happen in this later proceeding. There is no provision for this within the administrative code of the Public Utilities Act. No one has any idea if this is going to be a public hearing. This is going to be a two-way transaction. This is going to be a two-way transaction between GBX and the Commerce Commission, where after, apparently, GBX has gone to multiple banks. Who knows what those terms might be? Who knows how that might affect the rates that come through on their product? But at that point, they're going to sit in a room at the ICC and decide whether this meets the financial capability standard of the statute. This removes serious rights from landowners that exist right now. The commission set up that happens on projects like this, whether it's 8-406, 406.1, the public gets a say. The public gets to come in and cross-examine the witnesses that are brought forward. They get to bring in evidence as to how it might affect them. That is prohibited here. How in the world can we know what the effect is going to be on the energy provider or the customers when there has been no evidence presented? That is the core issue that we have here today. So there will be a second meeting with no public input. If there is public input, it's a mystery to us. There is no procedure within the administrative code. The witnesses within this case even said, from the ICC even said, they weren't really sure how this was going to happen or go about. But this is the showing. So, you know, we talk about statutory interpretation. I think it's important to see how the ICC has treated this issue before, what they have considered substantial evidence. That's what's required under the Public Utilities Act. It really deviates, and not only deviates, but the professionals within the ICC, those that are there to advise the ICC on the project itself, said they didn't review any evidence. They didn't think they needed to because of the revised financing condition. I have a question, and I think you're getting close to it, but it truly is an open-ended question about how the ICC works. Throughout the briefs, there is discussion of staff with a capital S, and especially when we're talking about deference to interpretation. Can you explain when you talk about staff at the ICC, what does that mean? Sure. And forgive me if my counterparts here come up and have a better explanation than I do, but it's the administrative agencies in Illinois, and this is pretty similar to other administrative agencies, where they're kind of the – somewhat of the prosecutor and the judge at the same time. So they are able to bring forward to educate the ICC on their opinion of the project. So they have – So as you were saying before, they're the professionals. They have expertise. Correct. So in these cases, whether it might be somebody that has some specialty in construction, to talk about whether the construction plan or the routing plan is appropriate and makes sense given the energy infrastructure in Illinois. They have economists that a lot of times will come in on the public use cases to talk about how it would affect the public, things like that. These are the experts of the ICC that present to the administrative law judge so that the administrative law judge can base their opinion that they're going to recommend to the Commerce Commission on whether the evidence presented meets the criteria of the statute. The project developer has the ability, obviously, to bring their own evidence, their own witnesses. And then the opponents, which would be us in this case, have the ability to bring our own witnesses and cross-examine them. What is key to this case, which was highlighted by the 5th District, was the burden is on GDX. The burden is not on the Landowners' Alliance or the landowners. It is their obligation to meet what the statute requires. And then the Public Utilities Act requires that the findings be supported by the evidence and that they be detailed within the order itself. And I would point to something very important within the order itself. The finding on the capability of financing, the finding within the order itself, says that GDX met the standard by, in quotes, agreeing to be bound by the revised financing condition. It didn't say that they brought X, Y, and Z evidence that showed that they were capable of it. It said because they met the revised financing condition, something not contemplated by statute. And when you look back at the evidence, none was presented. There were a few witnesses that appeared at the Commerce Commission and said, we've got this new startup company, but we've got a great backer in a parent company. Now they haven't signed a loan guarantee or committed anything to us, but we're very bright, we know some banks, and we know how to get this project done. So please trust us to move forward with the financing of this case. And because we're unsure if the commercial markets will support this project, let's do this revised financing condition because we don't know. I'm not sure why they didn't try to sign up like one windmill in Kansas, like a pre-subscription to supply if this project's approved. That would be the kind of thing a bank would want if they were going to fund a new startup business. They would want to see demand. They also could get a customer to sign up to say if this goes through, we as a merchant customer would sign up for this project. None of this was presented. This court, the most important thing here is that when they seek this authority under the act, they get a fast track to eminent domain power. That is a thing reserved for public utilities within the state traditionally, and it is an issue here. This court is the last line of defense against the misuse of governmental power for this shell company building a transmission overpass to Indiana. We ask this court to affirm the appellate court and revoke the certificate that was awarded to GPX. Thank you for your time. Thank you, Mr. Davis. Rebuttal? Thank you. I just want to address first the factual thing where he referred to the transmission line as an overpass over Illinois. You have to understand that these grids are set up so that the energy will go in Missouri to the MISO, but MISO flows into southern Illinois, so the energy going into Missouri flows into southern Illinois. Likewise, at the end of the project in Indiana, that flows into the PMG interconnection, which feeds northern Illinois. So while they're arguing this is an overpass, it's feeding into the grids that will supply both southern and northern Illinois as well as central Illinois. So the benefit comes to Illinois. That's just how the grids are set up. The grids are not within state lines with the somewhat exception of Texas. But I want to talk about the statutory interpretation questions. Justice Tice asked that the ICC, the legislature, have a broad use of language where the appellate court is interpreted narrowly, and Justice Cunningham said doesn't the appellate court's interpretation create a catch-22. I don't think I heard a specific response to that question. I know counsel said to Justice Cunningham that that could be a possible problem, and then when you asked whether or not the financing, financial relationships they had, couldn't that be a factor, he said maybe. So that gets into the statutory interpretation. If it's a broad language, it should be deferred to the ICC to determine that, or at the very least there's at least a reasonable interpretation. If the court just disagrees with a reasonable interpretation, it doesn't overrule that interpretation, and that's why the deference here is so important. But then when we get to the facts question, which is kind of what it led into, that they just essentially don't deem the evidence sufficient, and when I opened I talked about what the evidence was, but that's a determination for the ICC, and for this court, that determination is prima facie true. They found that the evidence was sufficient. This is like a jury verdict coming up and saying, well, you know what, they didn't testify to this, they didn't testify to that, they could have done this. That's not the question. It was what was before the jury, and could the jury have found that? That's the same thing here. There was plenty of evidence that there is years of building these sort of projects, 4,000 miles, $47 billion in contracts. This isn't just somebody like, I got a rich grandpa, I'd like to get into the energy business. This is what they do. This is structured in a way to bring this project to Illinois, which the General Assembly has said is a priority for Illinois. And so I think I'm running out of time. I also want to mention real quickly on eminent domain, we haven't received eminent domain authority, we haven't requested eminent domain authority. The record is clear. We would prefer to do all of these with voluntary easements. That's something that could happen down the road. I'm not going to contest that, but that's not something that is at issue before the court now. And regardless, eminent domain is a power that the Constitution invests with the government. The fact that it could be exercised sometime isn't a reason to stop a project. And so with that, I would just ask the court to reverse the Fifth District and affirm the ICC on all issues that were raised. Thank you. Thank you. Mr. Volk. Thank you. I'd just like to quickly address the question of the prior cases that counsel had raised here in both for purposes of interpreting subsection F3 and for, of course, the application of the commission's finding and trying to depart from it. Obviously, citizens' value was very much different from this case. It was just basically single conclusory testimony by the owner of the company who said that he would, you know, provide finances needed. As the court has pointed out, in this case, in difference, we have extensive testimony on the financing method identifying what it will be, how it works, the potential sources of lending. At this point, they don't know which bank it will be or which lenders or which equity investors, but how they're going to receive it. There's evidence on how they've done it before with billions of dollars in transactions. And there's evidence also that specifically going into how they're going to raise it through the market need and developer interest. And again, while we don't know which developers specifically will do it, we don't have, again, we don't have simply trust us evidence from GBX. They had conducted solicitations showing extensive interest by developers in purchasing that capacity, both from windmill owners, sorry, wind and solar developers, and then also from shippers who would also be another category of potential customers. They expressed interest which actually far exceeded the megawatt capacity that the interstate transmission line will have. The other cases, I mean, they point out, they look at other types of evidence was submitted in prior commission orders, but as I argued originally, that's not a decisional rule. The fact that in other cases other evidence has been provided in the past isn't the type of rule or decision which provides a basis for courts on administrative review to provide less deference to a factual finding. So when Ameren Transmission Company was going to have a transmission line that they were primarily trying to finance through, for instance, a parent company, then yes, they provided evidence about the parent company or about if they were going to, the whole financing plan is we're going to use this billion-dollar line of credit. They provided some very basic evidence about the existence of that line of credit. Here, they provided the evidence on the financing method that they're going to use, the project finance basis. This is one where, yes, the developer is not going to be putting up its own assets as collateral, but we did have testimony that they've got billions of dollars in assets. They've already provided $60 million in funding for this project and will continue to provide it in the future. That was sufficient evidence, far more than a centella for the commission to make its decision on. With regard to the revised financing condition, it's actually, there's no provision in the Act for it. It's a compliance filing, which happens in the rate-making cases and in all sorts of cases all the time, where there's an order to show that they've complied with the order. Here, the condition is the revised financing condition that later on, the GBX will have to submit the evidence showing that they have complied with that condition before they can commence actual construction facilities. There is no automatic hearing, but under the administrative rules, I think it's ED3, Illinois Admin, Section 200.190 provides a basis for them to challenge, to engage in motion practice if they believe that in the future, GBX has not complied with the revised financing condition. I believe it's 200.90, they could try to seek to reopen the hearing if they have some sort of factual basis for the commission to consider or to try to seek those facts. However, it is a procedure which is used in the rate-making cases and in other kinds of cases, in rate-making cases or in other parts of the statutes where you have a condition that has to be complied with after the final order. Whatever happens in the future, though, it won't be a re-litigation of whether or not GBX has satisfied subsection F3. That has already been decided. That is the point. This is just, this is an additional requirement on the condition which the commission imposed under its continuing jurisdiction, which this Court has recognized, it's under Section 10-113, and also under Section 8-503, in which the commission issues its order governing future construction of the infrastructure in the manner and in the time prescribed by its order. So unless Your Honors have any other questions for me, we ask that you reverse the appellate court judgment and that you affirm the commission's final administrative decision. Thank you, Mr. Turner. Case Numbers 131026 and 131032 is taken under advisement as Agenda Number 3.